# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MARY CHAMBERS OBO
M.V.T., MINOR,
      Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant

Case No. 1:10-cv-593
Spiegel, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for Supplemental Security Income (SSI) childhood disability benefits.  This matter is before the

Court on plaintiff's Statement of Errors (Doc. 5), the Commissioner's response in opposition

(Doc. 8), and plaintiff's reply memorandum.  (Doc. 9).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1999 and was ten years old at the time of the ALJ's decision.

Plaintiff's guardian filed an application for SSI childhood benefits on his behalf in January 2007,

alleging disability due to attention deficit hyperactivity disorder and oppositional defiant

disorder.  His application was denied initially and upon reconsideration.  Plaintiff requested and

was granted a de novo hearing before administrative law judge (ALJ) Ronald M. Kayser.  Two

hearings were held.  (Tr. 420-465, 466-490).  Plaintiff, who was represented by counsel,

appeared at the first hearing with his guardian Mary Chambers.  Both plaintiff and his guardian

testified at that hearing.  Following the first hearing, the ALJ requested an examination of

plaintiff by a consultative psychologist.  A second hearing was held at which Doug McKeown,

Ph.D., testified as a medical expert.

On July 31, 2009, the ALJ issued a decision denying plaintiff's SSI application.  (Tr. 21-32).  The Appeals Council denied plaintiff's request for review, making the decision of the

ALJ the final administrative decision of the Commissioner.  (Tr. 9).

### APPLICABLE LAW

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  The Court's sole function is to determine whether the record as a whole contains

substantial evidence to support the Commissioner's decision.  The Commissioner's findings

stand if they are supported by "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing

*Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  In deciding whether the

Commissioner's findings are supported by substantial evidence, the Court must consider the

record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as

defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202.  Eligibility is dependent upon

disability, income, and other financial resources. *Id.*; 20 C.F.R. § 416.202.  An individual under

the age of 18 is considered disabled for purposes of SSI "if that individual has a medically

determinable physical or mental impairment, which results in marked and severe functional

limitations, and which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

2

The Social Security regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of children's SSI benefits:

1. Is the child is engaged in any substantial gainful activity? If so, benefits are denied.

2. Does the child have a medically severe impairment or combination of impairments? If not, benefits are denied.

3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix 1 of 20 C.F.R. pt. 404, subpt. P. 20 C.F.R. § 416.924(a)? If so, benefits are granted.

20 C.F.R. § 416.924(a)-(d). An impairment which meets or medically equals the severity of a set of criteria for an impairment in the Listing, or which functionally equals a listed impairment, causes marked and severe functional limitations. 20 C.F.R. § 416.924(d).

In determining whether a child's impairment(s) functionally equal the Listings, the adjudicator must assess the child's functioning in six domains:

1. Acquiring and using information;

2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for yourself; and

6. Heath and physical-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi). To functionally equal an impairment in the Listings, an impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). The relevant factors that will be considered in making this evaluation are (1) how well the child initiates and sustains activities, how much

3

extra help he needs, and the effects of structured or supportive settings; (2) how the child

functions in school; and (3) how the child is affected by his medications or other treatment. 20

C.F.R. § 416.926a(a)(1)-(3).

An individual has a "marked" limitation when the impairment "interferes seriously with

[the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §

416.926a(e)(2)(i). A "marked" limitation is one that is "more than moderate" but "less than

extreme." *Id*. An "extreme" limitation exists when the impairment "interferes very seriously

with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §

416.926a(e)(3)(i). An extreme limitation may also seriously limit day-to-day functioning. *Id*.

If the child's impairment meets, medically equals, or functionally equals the Listing, and

if the impairment satisfies the Act's duration requirement, then the child is considered disabled.

20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not

considered disabled. 20 C.F.R. 416.924(d)(2).

## MEDICAL RECORD

### 2004 records

Plaintiff saw primary care physician Dr. Brewer at HealthPoint Family Care from July to

November 2004. Dr. Brewer diagnosed attention deficit hyperactivity disorder (ADHD) and

oppositional defiant disorder (ODD)[1] and provided medication. (Tr. 237-53).

---

[1] "Oppositional Defiant Disorder is a recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward authority figures that persists for at least six months and is characterized by the frequent occurrence of at least four of the following behaviors: losing temper, arguing with adults, deliberately doing things that will annoy other people, blaming others for his own mistakes or misbehavior, being touchy or easily annoyed by others, being angry and resentful, or being spiteful or vindictive. The behaviors must occur more frequently than is typically observed in individuals of comparable age and developmental level and lead to significant impairment in social, academic, or occupational functioning. In a significant proportion of cases this disorder is a developmental antecedent to Conduct Disorder. DSM-IV." *Goodman ex rel. Chambers v. Barnhart*, 247 F. Supp.2d 1249, 1251

4

Psychologist Mark D. Kroger, M.S., examined plaintiff in October 2004, when plaintiff was five years old. (Tr. 211-17). He diagnosed plaintiff with ADHD, ODD, and bed-wetting, resolving. (Tr. 216). He determined that plaintiff had a mild impairment in his ability to interact and relate with others, with a fair ability to communicate; fair ability to acquire and use information; moderate impairment in his ability to attend and complete tasks; and fair gross motor skills with moderate deficits in fine motor coordination and control. (Tr. 217).

In November 2004, state agency psychologist Dr. Scher and physician Dr. Sexton opined that plaintiff did not meet, medically equal or functionally equal a Listing. (Tr. 220-25). They further indicated that plaintiff had no limitations in either caring for himself or in moving about and manipulating objects; less-than-marked limitations in health and physical well being, acquiring and using information, and interacting and relating with others; and marked limitations in attending and completing tasks. (Tr. 222-25).

**2005 records**

Plaintiff did not see Dr. Brewer in 2005.

**2006 records**

Plaintiff saw Dr. Brewer in December 2006. (Tr. 234). Plaintiff's uncle reported that they were getting calls from school relating to plaintiff's ADHD symptoms and he was quite hyper at home. (*Id.*)

**2007 records**

Plaintiff saw Dr. Brewer in September, October, and December 2007. (Tr. 227-29). The ADD/ADHD Interim Assessment Form progress notes show plaintiff was having problems with

(N.D. Ala. 2003).

5

his ADHD symptoms at school, including climbing on desks and acting impulsive and "hyper." (Tr. 228). It was also noted that plaintiff was "getting into trouble now with ADHD and impulse control symptoms." (Tr. 227).

## 2008 records

Plaintiff's guardian took him to NorthKey Community Care in January 2008 because she could not tell if his ADHD medication (Adderall) was working anymore. She noted plaintiff's grades were "ok" but he could not focus, he has an "attitude," and he bothered his peers when he was supposed to be working. (Tr. 291). Her main concern was his alleged lying and his aggression when caught lying. (Tr. 291-92). When he got caught lying he would have outbursts and hit his head against the wall and write letters wishing he was dead. (Tr. 292). He stole from other children at school and did not comply with punishment when disciplined. (Tr. 292). He was at a moderate risk to self or others and it was noted that he became aggressive when he got in trouble for lying and had hit his guardian and thrown a T.V. (Tr. 355). Plaintiff attended six sessions with counselor Rohrs into May. (Tr. 292-300, 341, 344, 347). He was on a higher dose of Adderall which seemed to help, but was still getting into trouble at school and was almost suspended from the bus for his behavior. (Tr. 352). It was also noted that during this time plaintiff fought with another child, broke a bottle, and threatened to cut the other child. (Tr. 339). His therapist also noted that plaintiff reported he witnessed domestic violence and his biological mother stealing from the home. (Tr. 322).

In March 2008, state agency psychologist Dr. Stodola and physician Dr. Anzures opined that plaintiff did not meet, medically equal, or functionally equal any Listing (Tr. 303-04).[2] They

---

[2]Dr. Anzures opined only in the context of plaintiff's physical functioning. (Tr. 302).

also opined that plaintiff had no limitations in health and physical well being or moving about and manipulating objects; and less than marked limitations in caring for himself, acquiring and using information, interacting and relating with others, and attending and completing tasks.  (Tr. 305-08).

Testing was conducted in July 2008 based on forms completed by plaintiff's guardian about plaintiff's behavior and academic performance.  (Tr. 323-31).  The report does not identify the clinician or medical professional who ordered or interpreted the results.

Plaintiff saw Dr. Brewer, his treating physician, in February, July, August and December 2008.  (Tr. 312-19).  The ADD/ADHD Interim Assessment Form progress notes in February and July reflect continued behavioral problems at school (out of seat, throwing things, talking, and lying) and on the school bus.  (Tr. 316, 317).  He had tantrums at school and engaged in "much destructive behavior," including scratching a neighbor's jeep and breaking windows.  (Tr. 316). Dr. Brewer noted that plaintiff was aggressive towards his sister and cousin, used profanity towards people he did not know, and started a fire in a playground.  (*Id.*).  Dr. Brewer also noted irritability and pressured speech at times, and assessed probable bipolar spectrum disorder.  (*Id.*). In August 2008, Dr. Brewer noted that tantrums, throwing things, and anger were still problems, as were lying and stealing.  Plaintiff was noted to be very irritable with mood swings.  (Tr. 313-15).

In December 2008,  Dr. Brewer reported that plaintiff's ADHD symptoms had been under control, but recently plaintiff had been talking back to his teachers, doodling, rushing through his work, talking, not staying in his seat, and disrespectful.  (Tr. 312).  He was more defiant and

angry at home.  (*Id.*).  Dr. Brewer adjusted his medications, made a referral to counseling, and added the diagnosis of bipolar disorder, NOS.  (*Id.*).

On December 23, 2008, Dr. Brewer assessed plaintiff's limitations in the six domains of functioning.  (Tr. 309-310).  Dr. Brewer opined that plaintiff had no limitations in moving about and manipulating objects; moderate limitations in acquiring and using information and health and physical well-being; and marked limitations in attending and completing tasks, interacting and relating with others, and caring for himself.  (Tr. 309-10).  He indicated that plaintiff's ADHD and bipolar symptoms caused his marked limitations.  (Tr. 310).

**2009 records**[3]

Plaintiff saw Dr. Brewer in January 2009.  (Tr. 311).  He reported that plaintiff was "doing OK at school," but continued to have behavior problems at home, including "disrespect, tantrums, and ODD behavior."  (*Id.*).  Dr. Brewer suspected plaintiff's home behavior may have been attributable to the rebound effect of the Adderall "wearing off."  (*Id.*).  He also noted that plaintiff had a counseling appointment at NorthKey the following month.

Plaintiff was seen by Dr. Aden at HealthPoint Family Care in February 2009.  (Tr. 364-65).  On psychological examination, Dr. Aden reported plaintiff was rude, poorly cooperative, and sulken, with a restricted affect.  (Tr. 365).  He was assessed as negative for suicidal and homicidal ideation, but frequently told his guardian that "he wishes he 'weren't here' when angry."  (Tr. 365).  Dr. Aden assessed ADHD, ODD, and Mood Disorder, NOS.  Dr.

---

[3]Medical records submitted to the Appeals Council (Tr. 383-419) are not before the Court on its substantial evidence review.  Where the Appeals Council declines to review the ALJ's decision, the Court's review is limited to the record and evidence before the ALJ.  *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).

Aden continued plaintiff's medications for Abilify and Concerta, and discussed starting plaintiff on medication for his nocturnal bed wetting. (Tr. 364).

In April 2009, plaintiff was again sent to psychologist Mr. Kroger for a consultative examination. (Tr. 366-376). At the time of the consultative examination, plaintiff was 9 years, 9 months old. Mr. Kroger reviewed Dr. Brewer's treatment notes from March, April, and May 2008, the records from NorthKey, one teacher questionnaire from 2009, and the testing of plaintiff's guardian. (Tr. 366-68). Mr. Kroger reported that plaintiff's "activity level was limited by his resistence and oppositional behavior in which he verbally, straightforwardly and frankly refused to attempt any task requested of him." (Tr. 370). In an attempt to encourage plaintiff's participation, Mr. Kroger brought the guardian into the evaluation setting. Plaintiff still refused to attempt any task. Mr. Kroger reported that the guardian advised him that on the way to the evaluation setting, plaintiff told her in the cab that he would refuse to participate in the evaluation. (Tr. 371). As a result, Mr. Kroger had to rely on reports from plaintiff's guardian to render an opinion. (Tr. 375-76) (noting reliance on "reported educational history by guardian," "reported history provided by guardian," and results of testing completed by guardian). The only psychological testing measure that was able to be completed was the Conner's Hyperkinesis Scale (Parent Edition) with plaintiff's guardian serving as the informant. Plaintiff's "severe" symptoms included "excitability and impulsivity, restlessness (as in always up and on the go), denial of mistakes with projection of blame, failure to finish things, childish immaturity, distractibility with short attention span, and quick and drastic mood changes." (Tr. 371).

Mr. Kroger specifically noted plaintiff's "extremely inappropriate and atypical behaviors" in the waiting room prior to the attempted evaluation in which plaintiff, among other things, took

9

a five foot fake potted ficus tree, turned it sideways in his lap while sitting, and when asked to return the plant, did so but then began pulling off the leaves. (Tr. 370, 373). Mr. Kroger stated that plaintiff's "behavior . . . was very unusual for even extremely hyperactive children . . . [and] was suggestive of not only impulsive behavior, but extremely oppositional, defiant, and destructive behavior with little concern about the property of others." (*Id.*). Mr. Kroger opined that plaintiff's "loss of control is completely self-directed, and he presented as uncaring about any social expectations appropriate to his age." (Tr. 373-74).

Mr. Kroger diagnosed plaintiff with ADHD; Oppositional Defiant Disorder; rule out conduct disorder; rule out bipolar disorder. (Tr. 372). He opined that plaintiff's ability to engage in age-appropriate activities, to socialize, and to perform in social relationships was moderately to severely impaired; his ability to learn and to perform in educational pursuits from a cognitive perspective was fair, but was at least moderately to markedly adversely impacted by a combination of his attention and concentration difficulties and related impulsive behaviors; his ability to attend and concentrate and to complete tasks was moderately to markedly impaired; his ability to communicate was fair to at most mildly impaired; and his gross motor skills were at least fair if not adequate. (Tr. 374). Mr. Kroger completed a separate form that same month in which he indicated that plaintiff had no-to-less-than-marked limitations in both his ability to acquire and use information and moving about and manipulating objects. (Tr. 375-76). He also opined that plaintiff had less-than-marked limitations in his health and physical well-being. (Tr. 376). Mr. Kroger added that plaintiff had less-than-marked-to marked limitations in caring for himself. (Tr. 376). Finally, Mr. Kroger opined that plaintiff had marked-to-extreme limitations in attending and completing tasks and interacting and relating with others. (Tr. 375). As support

10

for these more extreme limitations, Mr. Kroger cited to the reported medical and educational history by plaintiff's guardian, the results of the Connor's Hyperkinesis Scale, his own behavioral observations prior to and during the formal evaluation, and "claimant's overt direct face-to-face behavior with this consultant." (Tr. 375).

In June, Dr. McKeown, the medical expert who testified at the hearing, completed a Childhood Disability Evaluation Form. He opined that plaintiff did not meet, medically equal or functionally equal a Listing. (Tr. 377-78). He further opined that plaintiff had either no limitations or less than marked limitations in every functional domain. (Tr. 379- 80).

## EDUCATIONAL RECORDS

### 2008 records

Plaintiff was reported to have misbehaved on the school bus in January. (Tr. 203). Plaintiff's school counselor reported in March that plaintiff was in regular classes, achieved average grades, and had never had to repeat a year in school. (Tr. 128-29). His principal reported that same month that plaintiff had problems staying focused and being successful in the classroom; he was easily distracted and became upset easily; he was disruptive in the classroom, defiant to his teachers, and treated others rudely; he was disrespectful on the playground, would not follow directions or listen, and talked back to teachers supervising recess; and he continually disrupted the classroom by yelling out, refusing to work, and arguing with others. (Tr. 130). Also in March, plaintiff's third-grade teacher (Tr. 135, 142) reported that plaintiff had no problem in acquiring and using information (Tr. 136); no-to-obvious problems in attending and completing tasks (Tr. 137); no-to-obvious problems in interacting and relating with others (Tr. 138); no problems with moving about and manipulating objects (Tr. 139); and no-to-serious

11

problems in caring for himself.[4] (Tr. 140). She noted that he typically had temper tantrums when dealing with disappointment, but he was "much more focused and put together" when on medication. (Tr. 138, 141). In August 2008, one of plaintiff's teachers reported that plaintiff had apparently stolen a directional compass from the science lab. (Tr. 185).

**2009 records**

In January, plaintiff's fourth-grade math teacher (Tr. 166, 173) reported that plaintiff had obvious-to-serious problems in acquiring and using information, and that he asked for a great deal of assistance in applying previous knowledge (Tr. 167); obvious-to-serious problems in attending and completing tasks, and that he "rarely" completed his work on time (Tr. 168); no-to-obvious problems in interacting and relating with others, requiring a behavior modification plan with hourly checks to help him follow rules (Tr. 169); no problems in moving about and manipulating objects (Tr. 170); and no-to-serious problems in caring for himself, noting that plaintiff "shuts down instead of asking for help." (Tr. 171).

Also in January, plaintiff's fourth-grade reading teacher (Tr. 174, 181) opined that plaintiff had no-to-obvious (but mostly slight) problems in acquiring and using information (Tr. 175); no-to-serious (but mostly slight-to-obvious) problems in attending and completing tasks (Tr. 176); no-to-slight problems in interacting and relating with others (Tr. 177); no problem in moving about and manipulating objects (Tr. 178); and no-to-serious (but mostly-no-to-slight) problems in caring for himself. (Tr. 179). His teacher noted that plaintiff often sought out extra support and would not do independent work; that it was difficult to identify what he knew and

---

[4]The Teacher Questionnaires submitted in 2008 (Tr. 135-42) and 2009 (Tr. 166-81) permitted the teachers to rate plaintiff in various component functions related to each functional area on a scale that ranged as follows: no problem; slight problem; obvious problem; serious problem; very serious problem.

did not know due to his frequent avoidance at applying himself; that he struggled with clearly expressing his thoughts; and that he had a behavior modification plan to monitor his work completion throughout the day.  (Tr. 175-77).

Plaintiff was assigned to detention once in February 2009 based on his refusal to do work assigned by his teacher, trying to pick a fight with another student, and not following directions in class.  (Tr. 202).  It was noted that plaintiff continued to be disrespectful to teachers and students.  (*Id.*).  Plaintiff was involved in two altercations with other students at school in March 2009 and was suspended for the second altercation for the remainder of the school day.  (Tr. 198).  In May 2009, plaintiff received a disciplinary referral for hitting and choking another student.  (Tr. 204).

## THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on May 19, 1999.  Therefore, he was a preschooler on January 1, 2005, the alleged onset date of disability, and is currently a school-age child. (20 C.F.R. 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 C.F.R. 416.924(b) and 416.972).

3. The claimant has the following severe impairments:  Attention Deficit Hyperactivity Disorder (ADHD); opposition defiance disorder; rule out conduct disorder; and rule out bipolar disorder.  (20 C.F.R. 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings. (20 C.F.R. 416.924(d) and 416.926a).

13

6. The claimant has not been disabled, as defined in the Social Security Act, since January 19, 2007, the date the application was filed (20 C.F.R. 416.924(a)).

(Tr. 24, 32).

In determining that plaintiff's impairments were not functionally equivalent to a listed impairment, the ALJ found:

1. Plaintiff has less than marked limitation in acquiring and using information. (Tr. 28).

2. Plaintiff has less than marked limitation in attending and completing tasks. (Tr. 29).

3. Plaintiff has less than marked limitation in interacting and relating to others. (Tr. 30).

4. Plaintiff has no limitation in moving about and manipulating objects.  (Tr. 30).

5. Plaintiff has no limitation in the ability to care for himself.  (Tr. 31).

6. Plaintiff has no limitation in health and physical well-being.  (Tr. 32).

## OPINION

Plaintiff assigns two errors in this case:

(1) The ALJ decision denying the Plaintiff's claim for childhood SSI disability benefits is contrary to law in that it is based on the medical source opinion of one Douglas McKeown, Ph.D.(?), who never examined the claimant or saw him, but rendered an opinion that said that claimant's "bad behavior and conduct" was willful and not the product of mental disease or defect, and therefore claimant's condition did not meet or equal any listing or functionally equal a listing.

(2) The evidence in favor of disability is strong in that claimant's long-time treating pediatrician, John Brewer, M.D., completed a form marked Exhibit 8F dated 12/23/08 showing that 3 domains were rated having "Marked" level limitations and the SSA examining psychologist, Mark D. Kroger, M.S., on 4/6/09 reported that he diagnosed claimant with ADHD, Oppositional Defiant Disorder on Axis I, with Rule Outs for conduct disorder and Bipolar Disorder and rendered an opinion based upon his examination that claimant functionally equaled the

14

listings with Marked to Extreme Ratings in Domains 2, Attending and Completing Tasks, and 3, Interacting and Relating to Others.

(Doc. 9 at 1-2).

Plaintiff contends the ALJ erred by giving more weight to the opinion of Dr. McKeown, the medical expert who testified at the hearing, than to Dr. Brewer, plaintiff's long-time treating primary care physician, and Mr. Kroger, the consultative psychological examiner. Both Dr. Brewer and Mr. Kroger offered opinion evidence indicating plaintiff's impairments were functionally equivalent to a listed impairment for purposes of children's SSI. The ALJ found these opinions to have "little probative value for the reasons identified by the medical expert in his testimony, whose testimony and assessment ha[ve] been found both persuasive and highly probative." (Tr. 27). The ALJ summarized Dr. McKeown's testimony as follows:

> The claimant's impairments are not of listing level severity. He noted the claimant is not in inpatient or group care, not in any intensive counseling program, not in a juvenile delinquent program, and has not been consistently kicked out of school for his behavior. The claimant's lack of cooperation (at the April 2009 consultative psychological examination) and his oppositional behavior are behavioral and not an uncontrollable mental behavior or disease. The defiance is oppositional behavior-it is a deliberate choice. The best way to deal with choice is consequence. Medication can serve to make a patient more adaptable but behavioral consequences have to be in place. The medical expert indicated that the claimant has been given medication and no real treatment. Juvenile justice referral will happen if his behavior continues. The claimant is on a mild to moderate dose of Adderal for ADHD, and Abilify (which he indicated is not FDA-approved for children but is used to slow claimant down). While claimant's grades in school were currently low B's, the grades only indicate performance and not lack of ability.

> The medical expert further indicated that the consultative psychologist's (an M.S. clinician-not a forensic psychologist) assessment (with marked to extreme limitations) was not supported by intensive therapy or inpatient care for the claimant, with no real evidence that the claimant cannot function in school. Moreover, the consultative examining psychologist based his diagnosis on the information supplied by the claimant's guardian; the claimant's refusal to

cooperate is not a basis for diagnosis. As to the claimant's primary care provider (a general practitioner is not trained in child psychology), the prescribed medication is not appropriate for bipolar disorder; there is no mood stabilizing medication. The medical expert's formal assessment is memorialized in the record as Exhibit 15F.

(Tr. 25-26). Exhibit 15F is a Childhood Disability Evaluation form completed by Dr. McKeown which indicates that plaintiff did not meet, medically equal or functionally equal a Listing (Tr. 377-78), and that plaintiff had "less than marked" limitations in each of the relevant six functional domains. (Tr. 379- 80).

Plaintiff contends that the opinion of Dr. Brewer, plaintiff's long-time treating physician, was entitled to weight greater than that afforded to the non-examining medical expert[5] under 20 C.F.R. § 416.927(d). Plaintiff also argues that Dr. Brewer's opinion finding marked limitations in the domains of attending and completing tasks and interacting and relating with others is consistent with Mr. Kroger's rating of "marked or extreme" limitations in those same domains. (Doc. 5 at 10). Plaintiff contends the ALJ failed to give "good reasons" for discounting the opinion of Dr. Brewer requiring a reversal in this case.

Plaintiff is correct that generally, the opinion of a treating physician is entitled to controlling weight if the opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley v. Commissioner of Social Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Wilson,* 378 F.3d at 544). A finding by the ALJ that a treating physician's opinion is not

_____

[5]Plaintiff takes issue with the characterization of Dr. McKeown as a "medical expert." (Doc. 5 at 1, 7, 11, 12, 13, 14). Dr. McKeown is listed as a Ph.D., psychologist. (Tr. 378). Plaintiff has presented no evidence disputing Dr. McKeown's credentials, nor did plaintiff challenge his credentials when he had the opportunity to do so at the hearing.

consistent with the other substantial evidence in the case record "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." Social Security Ruling 96-2p, 1996 WL 374188, at *4. "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(d)(2)(i)(ii); 416.927(d)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(3)-(6), 416.927(d)(3)-(6); *Wilson*, 378 F.3d at 544.

This case turns on the nature of plaintiff's Oppositional Defiant Disorder and the severity of plaintiff's functional limitations resulting from the ODD and ADHD. The ALJ relied on the opinion of the medical expert in this case, who thoroughly explained why, in his opinion, plaintiff's functional limitations were not as marked or extreme as those found by the treating and examining physicians.

First, in analyzing plaintiff's ODD diagnosis, the medical expert drew a distinction between a behavioral disorder and mental disease or defect. He explained that persons suffering from a mental disorder or defect lack the ability to behave in an appropriate fashion. (Tr. 471). In contrast, behavioral and conduct disorders, including oppositional disorders like the one in the present case, reflect not a lack of ability to control behavior, but rather a lack of cooperation or a deliberate level of activity and behavior. (Tr. 471-72). He testified that "defiance is the obvious basis for oppositional behavior. . . . It's not based on an individual's inability to behave or

17

perform. It's based on their choice not to." (Tr. 473). Dr. McKeown opined that plaintiff's

school records and Mr. Kroger's report reflect "issues and difficulties that basically are related to

behavioral difficulties, and not to some underlying uncontrollable mental defective disease." (Tr.

472). Upon cross-examination by plaintiff's counsel at the hearing, the medical expert clarified

that "a behavioral disorder is a type of mental disorder, but it's not a mental disease or not a

mental defect. It's behavioral dysfunction. Which means that with appropriate supervision,

control, and treatment, it is fully controllable. It basically happens because the environment is not

providing the necessary supervision consequences for actions and behavior." (Tr. 477). The

medical expert acknowledged that ADHD can meet the definition of disability depending on the

level of dysfunction, but that in plaintiff's case, the 2004 intellectual testing showed a pattern of

scores reflecting an ability to do fairly well even in those areas dealing with attention or

concentration. (Tr. 477). He testified that plaintiff's more recent school records reflecting grades

of low Bs are not necessarily related to ability, but rather to performance issues. (Tr. 478). In

other words, plaintiff has the ability, but his behavior problems impact his school performance.

*Id.*

Second, when asked about specific instances of physical aggression reflected in plaintiff's

school records and whether this was reflective of a more serious mental problem, Dr. McKeown

testified, "In my opinion based on the information that's available, it's primarily a behavioral

disorder." (Tr. 479). Dr. McKeown recognized that plaintiff had a behavioral plan at school, but

that did not affect his opinion on plaintiff's level of functioning for the following reasons: plaintiff

had no mental health intervention until just recently despite allegations of problems for about five

years; plaintiff was not engaged in a very intensive therapeutic intervention program that he would

18

expect if plaintiff's functional impairments were at the level of severity suggested by Dr. Brewer and Mr. Kroger; and the record reflected few counseling sessions with NorthKey and medication prescribed by plaintiff's physician (Tr. 480).

Third, in discussing Dr. Brewer's diagnosis of bipolar disorder and Mr. Kroger's diagnosis of rule out bipolar disorder, Dr. McKeown explained that there was insufficient evidence to indicate a level of severity for a bipolar disorder diagnosis and suggested that a referral to a psychiatric specialist for purposes diagnosing a bipolar disorder would be the norm. (Tr. 482). He questioned plaintiff's general practitioner's diagnosis of bipolar in the absence of further information about his background and stated that bipolar appeared to be an issue in this case because plaintiff's treating physician was prescribing Abilify, which was not intended to address the variability of moods in a bipolar disorder. (Tr. 482, 485). He noted that the medication prescribed by plaintiff's general practitioner was an atypical anti-psychotic medication and there was no indication in the record that plaintiff suffered from psychotic symptoms. (Tr. 486).

Fourth, in reviewing Mr. Kroger's reported findings of marked and severely impaired functional abilities, Dr. McKeown noted that Mr. Kroger appeared to lump plaintiff's ability and performance together in assessing plaintiff's functional limitations. Dr. McKeown again drew a distinction between behavior and ability: "[W]hen you look at what his treatment is, what his medication is, the fact that he's progressed through the school system, the fact that he hasn't had to be hospitalized or placed in the juvenile system or the like, then what we're dealing with is something that is his demonstrated activity, which is apparently what Mr. Kroger evaluated." (Tr. 483). Dr. McKeown disagreed with Mr. Kroger's assessment of "marked" and "extreme" limitations in two of the functional domains based on his own professional experience: "And

19

based on the fact that I am the clinical director of an adolescent inpatient facility that has 90 kids

in it, if I ever saw in my inpatient unit that type of evaluation, it would be somebody that would be

on an inpatient unit.  They wouldn't be able to function in the school system at all." (Tr. 484).

Dr. McKeown acknowledged that someone with oppositional defiant disorder and ADHD can be

found disabled, but explained that the "severity issue here is quite significant" and that plaintiff's

impairments had not yet reached the level of severity required for functional equivalence: "In my

opinion, it just doesn't reach that severity level.  It's not become so severe that he's in a detention

facility, in a group home, in a juvenile adolescent program, that he's been just completely kicked

out of school or the like, or he's been in an inpatient hospital facility.  I mean, there's just nothing

in here that indicates he has ever been to that extent of severity."  (Tr. 484, 488).

The ALJ adopted Dr. McKeown's opinions and reasoning as his own, finding the medical

expert's testimony both persuasive and highly probative.[6]  (Tr. 27).  The ALJ's decision in this

regard is based on evidence that "a reasonable mind might accept as adequate to support a

conclusion."  *Rogers*, 486 F.3d at 241 (internal quotation marks and citation omitted).  Here, the

ALJ was faced with conflicting evidence as to the severity of plaintiff's functional limitations and

the cause of such limitations, and it was his duty to resolve the conflicts in the competing medical

---

[6]Plaintiff suggests that the Commissioner's response in opposition to his statement of errors totally restates and recasts the ALJ's decision for reasons not given by the ALJ in an attempt to show the decision is supported by substantial evidence. (Doc. 9 at 1).  Plaintiff is correct that a court may not accept the Commissioner's post-hoc rationalization in support of the ALJ's decision where the ALJ fails to weigh a treating physician's opinion in accordance with Social Security's procedural regulations.  A court cannot excuse the failure even though there may be sufficient evidence in the record supporting the ALJ's decision. *Wilson*, 378 F.3d at 546. Here, however, the ALJ summarized in detail the medical expert's testimony and reasons for disagreeing with the opinions of Dr. Brewer and Mr. Kroger (Tr. 25-26) and adopted those reasons by stating he gave little probative value to the treating and examining sources "for the reasons identified by the medical expert in his testimony." (Tr. 27).  The Commissioner's response highlights those reasons and there is nothing improper about the response.

opinions. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ was frank about his

need to better understand the nature of plaintiff's oppositional behavior in this case. (Tr. 471).

The ALJ was permitted to consider Dr. McKeown's expert testimony to assist in understanding

and reconciling the medical evidence of record. *See Massey v. Comm'r of Soc. Sec.,* 409 F. App'x

917, 921 (6th Cir. 2011) (finding ALJ did not err in failing to give controlling weight to a treating

physician where ALJ relied on a medical expert's hearing testimony, which cast doubt on treating

physician opinion).

In weighing the medical opinions in this case, the ALJ was entitled to consider that Dr.

McKeown is a specialist and holds a doctoral degree in psychology in comparison to Dr. Brewer,

who was a general practitioner, and Mr. Kroger, who had a master's degree in psychology. *See*

*Johnson v. Commissioner of Social Sec.,* __ F.3d __, 2011 WL 2652192, at *5 (6th Cir. July 8,

2011) (opinion of a specialist with respect to medical condition at issue is given more weight than

that of a non-specialist) (citing 20 C.F.R. § 404.1527(d)(5)).

In addition, while Dr. McKeown never examined plaintiff, he provided testimony at the

administrative hearing based on his review of the entire record. Under certain circumstances the

opinions of non-examining State agency medical or psychological consultants may be given

greater weight than the opinions of treating or examining sources. Social Security Ruling 96-6p,

1996 WL 374180, *3 (July 2, 1996). "For example, the opinion of a State agency medical or

psychological consultant or other program physician or psychologist may be entitled to greater

weight than a treating source's medical opinion if the State agency medical or phychological

consultant's opinion is based on a review of a complete case record that includes a medical report

from a specialist in the individual's particular impairment which provides more detailed and

comprehensive information than what was available to the individual's treating source." Social Security Ruling 96-6p, 1996 WL 374180, *3. *See also Mitchell v. Commissioner of Social Sec.,* 330 F. App'x 563, 568 (6th Cir. 2009). Unlike Dr. Brewer or Mr. Kroger, Dr. McKeown was the only expert to review the entire case file. *See Blakely*, 581 F.3d at 409 (ALJ may rely on non-examining source opinion over treating source opinion when non-examining source bases the assessment on a review of the complete medical record); *Atterbery v. Secretary of Health and Human Services*, 871 F.2d 567, 570 (6th Cir. 1989) (opinions of a non-examining State agency psychological adviser that are consistent with evidence of record represent substantial evidence to support ALJ's findings).

Dr. McKeown based his opinion not only on his review of the entire record, but his own professional experience with mentally impaired youth. (Tr. 484). Based on his psychological expertise and experience, Dr. McKeown testified that his review of all the evidence indicated that plaintiff's behavior was a deliberate choice and not the product of a mental limitation or disease which could impose the marked and extreme limitations found by Dr. Brewer and Mr. Kroger. Dr. McKeown noted that the treatment plaintiff received for his oppositional behavior was not commensurate with the level of severity set forth in the opinions of Dr. Brewer and Mr. Kroger. Plaintiff had been given medication, but had neither received nor been recommended for intensive counseling or inpatient treatment. He had been consistently promoted to subsequent grade levels in school, was in regular (not special) education classes, and had achieved average grades. With the exception of being suspended from school for the part of one day, he had not received the type of disciplinary or corrective action from school officials or the juvenile justice system that would be expected of a child with the marked and extreme limitations found by Dr. Brewer and Mr.

Kroger.  In view of the conflicting opinions in this case, the ALJ's decision to credit that of Dr.

McKeown over those of Dr. Brewer and Mr. Kroger is substantially supported by the record.

Nevertheless, plaintiff asserts the ALJ had a preconceived notion that he would deny

plaintiff's claim for disability benefits as evidenced by the ALJ's oral denial of counsel's request

for a second opportunity to have plaintiff evaluated by Mr. Kroger.  (Tr. 489).  At the hearing, the

ALJ stated, "No.  I think he gave an indication when he told his - - Ms. Chambers he wasn't going

to cooperate in the car.  *That told me everything I needed to know.  I mean, I could've made a*

*decision right there*."  (A.R. 489) (emphasis added by plaintiff).  Plaintiff contends the ALJ

considered himself a psychological expert and improperly rendered a medical opinion he was not

qualified to make.  (Doc. 5 at 9).

The Court's review of the ALJ's statements does not support plaintiff's contention.   The

ALJ stated that he found plaintiff to be a bright, capable child with potential who lacked discipline

in his life and who has shown his behavior is within his control.[7]  A fair reading of the ALJ's

statements reflects the ALJ's agreement with Dr. McKeown's opinion that plaintiff's actions

reflect volitional behavior on his part, as opposed to an inability to control his behavior, and that

---

[7]The ALJ's statement, in context, is as follows:

No.  I think he gave an indication when he told his-- Ms. Chambers he wasn't going to cooperate
in the car.  That told me everything I needed to know.  I mean, I could've made a Decision right
there.  Because I've seen enough kids where the indicate-- he's - -this child is not stupid.  This
child has-- he's bright.  He has potential.  But he doesn't have any discipline in his life.  He
doesn't have a father image.  He's basically allowed to run wild.  That's no indictment of Ms.
Chambers.  That's just the fact that she has to deal with.  I think this child knows exactly-- he's a
manipulator.  He knows exactly what he's doing.  And he's going to find himself in a juvenile
facility sooner or later.  That's what I can predict.  No, I don't think it would be-he's had an
opportunity.  He's shown himself what he's capable of doing and capable of not doing.  I don't
think it would be productive.  I think, as you pointed out aptly, severity is an issue here.  And it
certainly is going to be telling sooner or later, unfortunately. . . .

(Tr. 489).

another chance at a consultative examination would not be productive.  (Tr. 489).  More importantly, the ALJ's written decision reflects that he based his decision on Dr. McKeown's testimony and not on his own preconceived notion of plaintiff's behavior at the consultative examination.  Plaintiff's argument does not undermine the ALJ's decision in this case.

Plaintiff also takes issue with Dr. McKeown's disagreement with Mr. Kroger's opinion on the severity of plaintiff's condition because Mr. Kroger's opinion was not based on any diagnostic information he was able to obtain from an evaluation or testing of plaintiff, but was based entirely on information he was provided.  (Tr. 487).  Plaintiff contends that this criticism  applies with equal force to the medical expert's opinion because the medical expert, like Mr. Kroger, performed no testing or evaluation of plaintiff, but relied only on the records provided to him from others.  (Doc. 5 at 11).

The distinction, however, as noted in the ALJ's decision, is not only the comparative qualifications of Mr. Kroger ("an M.S. clinician–not a forensic psychologist") and Dr. McKeown (a Ph.D. in psychology), but the informational basis upon they rendered their opinions.  Unlike Mr. Kroger, Dr. McKeown reviewed the entire record, including plaintiff's school records, Dr. Brewer's progress notes, and plaintiff's counseling sessions at NorthKey, and relied upon his own professional experience with mentally impaired youth.  (Tr. 469-70, 479, 484).  In contrast, Mr. Kroger relied heavily on the reports from plaintiff's guardian, one school report, and Dr. Brewer's March, April, and May 2008 progress notes.  The ALJ reasonably relied on the more comprehensive opinion of Dr. McKeown over that of Mr. Kroger and his reasons therefor are substantially supported by the record.

24

The ALJ fully considered the opinions of Dr. Brewer and Mr. Kroger and reasonably relied on the reasons given by Dr. McKeown for discounting these opinions.  In addition, the ALJ also considered the opinions of the state agency psychologists who opined that plaintiff did not functionally equal any listed impairment. (Tr. 220-25, 303-308).  Contrary to plaintiff's contention, the ALJ provided "good reasons" for discounting the opinions of Dr. Brewer and Mr. Kroger in conformance with the regulations and *Wilson*, 378 F.3d at 545.  Substantial evidence therefore supports the ALJ's rejection of these medical source opinions.  Even if this Court were inclined to resolve the conflict in the medical evidence differently, the ALJ's determination must stand if it is supported by substantial evidence. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983). *See also Bogle v. Sullivan,* 998 F.2d 342, 347 (6th Cir. 1993).  Likewise, the Court must affirm an ALJ's decision if the findings and inferences reasonably drawn from the record are supported by substantial evidence, even if the record could support the opposite conclusion. *See Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  The ALJ reasonably relied on the opinion of Dr. McKeown for the reasons given and, as such, his decision is substantially supported by the record and should be affirmed.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: _8/29/2011_

_Karen L. Litkovitz_
Karen L. Litkovitz
United States Magistrate Judge

25

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

MARY CHAMBERS OBO
M.V.T., MINOR,                                    Case No. 1:10-cv-593
      Plaintiff                              Spiegel, J.
                                                 Litkovitz, M.J.

    vs


COMMISSIONER OF
SOCIAL SECURITY,
      Defendant

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).